Mark J. Goldberg (MG 2398)
Mark A. Douglas (MD 3221)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone: 212.407.4000
Facsimile: 212.407.4990

**JUDGE FURMAN**

Daniel A. Platt (*Pro Hac Vice –to be filed*)
Robert J. Catalano (*Pro Hac Vice – to be filed*)
Eric Schwartz (*Pro Hac Vice – to be filed*)
LOEB & LOEB LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA 90067
Telephone: 310.282.2000
Facsimile: 310.282-2200

*Attorneys for Plaintiff*
*Meritain Health, Inc.*

12 CV 7791

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERITAIN HEALTH, INC., Plaintiff, v. LEANNE APPELDORN, an individual, ARIZONA EMPLOYERS INSURANCE, INC., an Arizona Corporation, Defendants. | No. ___________ **COMPLAINT** |




Plaintiff Meritain Health, Inc. ("Plaintiff" or "Meritain"), through its attorneys, Loeb & Loeb LLP, for its complaint against Defendants Leanne Appeldorn ("Appeldorn") and Arizona Employers Insurance, Inc. ("AEI-2"), alleges as follows:

## INTRODUCTION

1. On or about June 30, 2010, pursuant to a written Stock Purchase Agreement (the "Agreement"), defendant Appeldorn, among others, sold all of her shares of Administrative Enterprises, Inc. ("AEI"), a third party administrator of self-funded employee benefit plans, to Meritain for $15 million. As part of the transaction, Appeldorn agreed not to (a) compete with Meritain; (b) solicit or hire its employees; (c) disparage it; or (d) solicit any of its clients for five years, or through June 2015 (the "Restrictive Covenants"). Despite this agreement, Appeldorn formed a new entity with the same acronym, AEI-2, and has violated all of the Restrictive Covenants. Meritain brings this complaint to force Appeldorn to comply with the terms of the Agreement and to recover its damages.

## THE PARTIES

2. Meritain is, and at all times relevant hereto was, a New York corporation, duly organized and existing under the laws of the State of New York with its principal place of business in Buffalo, New York.

3. Upon information and belief, Defendant Appeldorn, an individual, is, and at all times relevant hereto was, a citizen and resident of the State of Arizona with a primary residence at 6217 W. Saguaro Park Lane, Glendale, Arizona.

4. Upon information and belief, Defendant AEI-2 is, and at all times relevant hereto was, an Arizona corporation, duly organized and existing under the laws of the State of Arizona with its principal place of business at 6217 W. Saguaro Park Lane, Glendale, Arizona.

5. Meritain is informed, believes and thereon alleges that AEI-2 and Appeldorn (collectively "Defendants") were in some manner responsible for the acts alleged herein and the harm, losses and damages suffered by Meritain. Meritain is informed and believes, and on that basis alleges, that AEI-2 is the alter ego of Appeldorn and Appeldorn dominates and controls all of AEI-2's business operations. Appeldorn is a principal owner, officer and director of AEI-2; the business address for AEI-2 is the same as the address for Appeldorn's primary residence; there is unity of ownership and interest between AEI-2 and Appeldorn; the credit of one is used as the credit of the other; AEI-2 was organized and capitalized for (or continues to be operated with) sums of money insufficient to meet their reasonable business requirements; and AEI-2 was created to avoid personal liability and to defraud creditors. Unless the fiction of the separateness of Appeldorn from AEI-2 is ignored, Appeldorn will be able to continue to engage in unfair competition against Meritain, fraud will be sanctioned, and Meritain will be irreparably harmed.

**JURISDICTION AND VENUE**

6. This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over claims against AEI-2 pursuant to 28 U.S.C. § 1367. *See Knox v. Arascom Telecom Holding S.A.E.*, 477 F.Supp.2d 642, 648 n.5 (S.D.N.Y. 2007) (where Court has jurisdiction over claim asserted against one defendant, Court also has jurisdiction over similar claims asserted against alter egos).

7. This Court has personal jurisdiction over Appeldorn because the Agreement provides that New York is the exclusive forum for any dispute arising out of the agreement and that the Agreement shall be governed by, and interpreted in accordance with, the laws of the

State of New York. *See National Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964) ("[p]arties to a contract may agree in advance to submit to the jurisdiction of a given court").

8. This Court has personal jurisdiction over AEI-2 because it is the alter ego of Appeldorn. *See National Equip. Rental, Ltd.*, 375 U.S. at 316 (1964); *see also Miller v. Tony & Susan Alamo Foundation*, 942 F.2d 143, 148 (8th Cir. 1991) (consent to jurisdiction by "alter ego" waives personal jurisdiction objections as to related party).

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391.

## THE AGREEMENT

10. Meritain and AEI are both third party administrators ("TPA"), which administer self-funded medical plans and provide marketing services. On or about July 30, 2010 (the "Closing Date"), Meritain and Appeldorn, among others, entered into the Agreement pursuant to which Meritain purchased one hundred percent of the outstanding equity interests of AEI from its owners, TRG Healthcare, Inc. ("TRG") – the 90% owner – and defendant Appeldorn – the 10% owner – in exchange for approximately $15 million. A true and correct copy of the Agreement is attached hereto as **Exhibit A** and is incorporated by reference. While the Agreement is styled as a Stock Purchase Agreement, Meritain was, in effect, purchasing AEI's book of business and, as is typical, its sellers' promises not to undermine that purchase, including detailed agreements not to compete or interfere with that business.

**ASBAIT**

11. AEI's largest client was, and is today, the Arizona School Boards Association Insurance Trust ("ASBAIT"). Meritain purchased AEI largely to acquire this particular client, which represents approximately $10,000,000 in annual revenue.

12. In order to ensure that it properly valued the transaction and that ASBAIT would remain AEI's client, Meritain took three protective measures. First, Meritain insisted on having ASBAIT confirm it intended to remain with AEI after the sale was consummated, which it did.

13. Second, Section 2.3(c) of the Agreement contains an "ASBAIT Condition," which placed $500,000 of the purchase price for AEI in escrow for 12 months to be released only in the event that ASBAIT remained with AEI.

14. Third, the Agreement contains fully negotiated non-compete, non-solicitation, confidentiality and non-disparagement clauses. The geographic scope of the non-compete clause was decreased from a national scope to include only Arizona at the sellers' request.

15. Section 7.3(a) of the Agreement provides that Appeldorn will not compete against Meritain until July 30, 2015:

> Each of the Sellers hereby covenants and agrees that, from and after the Closing and until the fifth (5th) anniversary of the Closing Date, it or she shall not, anywhere in the State of Arizona, directly or indirectly, either as an equity holder, investor, partner, manager, employee, consultant or otherwise, participate in the management, operation or control of, or have any financial or ownership interest in, or otherwise financially assist, or permit his, her or its name to be used in connection with, any business or entity that engages in the business of the provision of medical claims administration services or any employer provided healthcare benefit services to any third parties. Each Seller agrees that the duration and geographic scope of the non-competition provision set forth in this Section 7.3(a) are reasonable.

16. Section 7.3(b) of the Agreement provides that Appeldorn will not use AEI's confidential information:

> From and after the date of this Agreement, each Seller shall keep and shall cause their respective Affiliates to keep, and shall use reasonable efforts to cause their respective present and former employees to keep, any and all confidential and proprietary information relating to the Business, the Company, the business operations and prospects (including customer lists and related information) of the Company, or services and know-how relating to the Company or the Business (all of the foregoing information, collectively, the "Confidential Information") confidential and shall not use or disclose such Confidential Information to any Person; *provided*, *however*, that each Seller may disclose such information that (i) is or becomes publicly available other than by disclosure by either Seller or any of their employees, representatives, agents or Affiliates or (ii) either Seller is advised by legal counsel that it is required to disclose by Law; *provided*, *further*, that in the case of disclosure compelled by Law, the applicable Seller shall (to the extent permitted by applicable Law) notify Purchaser in writing promptly of the request and the documents requested thereby so that Purchaser may seek an appropriate protective order or other appropriate remedy; *provided*, *further*, that, such Seller shall limit any such disclosure to the precise terms of such requirement and shall cooperate with Purchaser (at Purchaser's cost) to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to such information by the tribunal or other Person. Each Seller agrees that she or it is liable for any breach of this Section 7.3(b) by each of their respective Affiliates as if they were a party hereto.

17. Section 7.3(c) of the Agreement provides that Appeldorn will not solicit AEI's employees until July 30, 2015:

> Each Seller hereby covenants and agrees that, from and after the Closing and until the fifth (5th) anniversary of the Closing Date, it or she shall not directly or indirectly (i) hire, solicit or encourage to leave the employment of the Company, Purchaser or any of their respective Affiliates, any employee of the Company or hire any such employee who has left the employment of the Company within one (1) year of the termination of such employee's employment with the Company; provided, however, that this Agreement shall in no way restrict either Seller from hiring any person who first contacts the applicable Seller in response to a general advertisement for employment to the public in a newspaper of general circulation or by other similar means or (ii) solicit or attempt to solicit or participate in the solicitation of or otherwise advise or encourage (A) any existing client or customer of the Company as of the Closing and/or (B) the existing clients or customers of Purchaser or any of its Affiliates (excluding the Company) anywhere in the State of Arizona as of the Closing, in either of (A) or (B), to

become a client or customer of any individual or entity engaged, directly or indirectly, in the business of (1) managing health benefit plans (including the provision of medical cost containment services) for self-funded employer groups and other healthcare payors, (2) providing medical management services to healthcare payors, and (3) providing pharmacy benefit services to self-funded employer groups and other healthcare payors.

18. Section 7.3(d) of the Agreement provides that Appeldorn will not disparage AEI or Meritain:

> From and after the Closing, each Seller shall, and shall use its or her best efforts to cause their respective Affiliates to, refer all inquiries regarding the Business or the Company to the Company, Purchaser and their Affiliates. Neither Seller shall disparage, portray in a negative light, or make any statement which would be harmful to, or lead to unfavorable publicity for, the Business, Purchaser Guarantor or any direct or indirect subsidiary of Purchaser Guarantor (including the Company) listed on Schedule 7.3(d)(1) to this Agreement, or any of its or their current or former directors, officers or employees, including without limitation, in any and all interviews, oral statements, written materials, electronically displayed materials and materials or information displayed on internet- or intranet-related sites; provided however, that this sentence will not apply to the extent either Seller is making truthful statements when required by Law or by order of a court or other legal body having jurisdiction or when responding to any inquiry from any Governmental Body. Neither Purchaser nor the Company shall disparage, portray in a negative light, or make any statement which would be harmful to, or lead to unfavorable publicity for, any Seller, TRG Guarantor or any direct or indirect subsidiary of TRG Guarantor in the United States listed on Schedule 7.3(d)(2) to this Agreement, or any of its or their current or former directors, officers or employees, including without limitation, in any and all interviews, oral statements, written materials, electronically displayed materials and materials or information displayed on internet- or intranet-related sites; provided however, that this sentence will not apply to the extent Purchaser or Company is making truthful statements when required by Law or by order of a court or other legal body having jurisdiction or when responding to any inquiry from any Governmental Body.

**<u>AEI-2</u>**

19. Notwithstanding Section 7.3 of the Agreement, Appeldorn caused AEI-2 to be incorporated on or about August 6, 2012. AEI-2's principal place of business is in Glendale, Arizona. The articles of incorporation state that AEI-2 "intends to conduct the business of:

marketing and administration of group insurance programs." Defendant Appeldorn is listed as a director on the AEI-2 Articles of Incorporation along with former AEI employees Darren Stevenson ("Stevenson") and Wayne Carpenter ("Carpenter").

20. Carpenter was the VP of Sales and Marketing at AEI for 20 years. Carpenter left AEI in or around January 2011, ostensibly to start his "early retirement." Upon information and belief, Appeldorn solicited and employed Carpenter in violation of the Agreement. Carpenter is currently employed as the Chief Marketing Officer of AEI-2.

21. Stevenson served for 10 years as IT Manager for AEI. In that role, Stevenson was responsible for installing AEI's proprietary and confidential technology platform. Stevenson was fired from AEI for performance reasons effective November 3, 2011. Stevenson is currently employed as the Chief Information Officer of AEI-2.

22. On or about July 1, 2012, Stevenson registered the domain name azemp.com (the "Website") for use by AEI-2. AEI-2 is described on the Website as "an Arizona-based organization serving the marketing and benefit administration needs of Arizona employers. As an insurance plan administrator, AEI has developed a Service model that enables it to facilitate an array of highly customized benefit management services. . ." True and correct copies of certain pages from the Website are attached as **Exhibit B** and are incorporated by reference.

23. On or about September 13, 2012, Defendants sent the following letter (the "September 13th Letter") to the ASBAIT Board of Trustees:




Office: 602.288.7841
Fax: 602.288.7848
Website: azemp.com

Your Satisfaction is Our Business

**Date:** September 13, 2012
**To:** ASBAIT Board of Trustees, Jerry Edwards
**From:** Arizona Employers Insurance, Inc.

"AEI" is a familiar name to ASBAIT. For nearly three decades the term "AEI" stood for unrivaled quality customer service, accurate claims processing, sound underwriting, and a dedication to helping the program's members understand and utilize their health benefits. Unfortunately, corporate acquisition of "AEI" has resulted in a stark drop in those quality services.

Former members of the original "AEI", realizing this decline in services, have established a new TPA in an effort to return high-value services back to ASBAIT. We are Arizona Employers Insurance, Inc., the new **AEI**, 100% Arizona owned and operated.

The new **AEI** is the benefactor of an established reputation and trust, name recognition, long-term relationships, and with a fully trained staff with years of experience, we will be able to return ASBAIT to the superior service levels that we provided it for over 15 years. Being Arizona based, we understand our State's insurance and medical community, the public sector and public school business, and most importantly every detail of the ASBAIT program and how to service its unique needs.

The high-touch, customer focused dedication and integrity has returned! The new **AEI** looks forward to renewing our relationship with ASBAIT through our response to the impending RFP.

To learn more about **AEI** please call or email us.
You can also visit us at: www.azemp.com

Respectfully,

Leanne Appeldorn – Chief Financial Officer
leanne.appeldorn@azemp.com

Wayne Carpenter – Chief Marketing Officer
wayne.carpenter@azemp.com

Darren Stevenson – Chief Information Officer
darren.stevenson@azemp.com

24. Upon information and belief, subsequent to sending the September 13th Letter, Defendants submitted a formal proposal to ASBAIT in an effort to procure the marketing portion of their business.

25. Appeldorn's actions, if allowed to continue, will cause irreparable harm to Plaintiff in that she will disrupt and irreparably harm Meritain and AEI's relationship with its clients and consultants, disrupt the operations of Meritain and AEI, and cause key employees of Meritain and AEI to terminate. Moreover, Meritain purchased the business clients and reputation of AEI, which took approximately 26 years to develop. Appeldorn's actions in attempting to usurp those clients and harm that reputation will cause irreparable harm.

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**

(Breach of Contract)

26. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 25 as if set forth fully herein.

27. Plaintiff Meritain and Defendant Appeldorn were parties to a valid and binding Agreement that provided for the sale AEI. The Agreement also provided that:

a. Appeldorn would not compete with AEI or Meritain in Arizona for five years commencing July 30, 2010;

b. Appeldorn would not solicit or employ AEI employees for a period of five years commencing July 30, 2010;

c. Appeldorn would not solicit AEI or Meritain clients for a period of five years commencing July 30, 2010;

d. Appeldorn would not disparage AEI or Meritain; and

e. Appeldorn would not use or disclose confidential information relating to AEI's business operations and prospects (including customer lists and related information), or services and know-how relating to the company or the business.

28. In consideration for these promises, and for the acquisition of AEI, Meritain paid the sellers in excess of $15 million, of which Appeldorn received approximately $1.5 million.

29. Meritain fully performed under the Agreement in all material respects.

30. Defendants materially breached the Agreement by competing with Meritain and AEI; soliciting and employing AEI employees including Carpenter and Stevenson; soliciting AEI and Meritain clients, including ASBAIT; disparaging AEI and Meritain to AEI clients; and using and disclosing confidential and proprietary business information belonging to AEI.

31. Defendants' numerous breaches have caused irreparable harm to Meritain, and are certain to imminently cause further irreparable harm if Defendants are not enjoined from further breaching the Agreement.

32. Defendants' numerous breaches have caused, and will imminently cause, monetary damage to Meritain in an amount to be determined according to proof.

**SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**
(Fraud in the Inducement)

33. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 32 as if set forth fully herein.

34. In or around July 2010, Appeldorn knowingly misrepresented and misstated to Meritain that she would not compete with AEI or Meritain in Arizona for five years commencing July 30, 2010; would not solicit or employ AEI employees for a period of five years commencing July 30, 2010; would not solicit AEI or Meritain clients for a period of five years commencing July 30, 2010; would not disparage AEI or Meritain; and would not use or disclose confidential information relating to AEI's business operations and prospects (including customer lists and related information), or services and know-how relating to the company or the business..

35. At the time Appeldorn made the aforesaid misrepresentations and misstatements, she knew she had no intention of performing any of said representations made to Meritain. Such misrepresentations and misstatements were made with the intent to defraud and deceive Meritain, and to induce Meritain to act.

36. Appeldorn intentionally or recklessly made such misrepresentations and misstatements or omitted to state her true intentions with the knowledge and intent that Meritain would rely on them.

37. Meritain did, in fact, reasonably rely to its detriment upon such misrepresentations and omissions, by executing the Agreement and acquiring AEI at a price in excess of $15 million.

38. It was not until Meritain was contacted by ASBAIT's broker that it learned or could reasonably have learned that Defendants did not intend to fulfill the representations Appeldorn had made to Meritain.

39. If Meritain had known the truth about the misrepresentations and concealments made to it by Appeldorn, Meritain would have never purchased AEI or executed the Agreement.

40. As a direct and proximate result of the foregoing fraud, Meritain has been irreparably harmed. Meritain respectfully requests that Defendants be enjoined from further breaching the Agreement.

41. Meritain has suffered monetary injury and Defendants have been unjustly enriched by reason of the foregoing. Accordingly, Defendants are liable to Meritain for money damages in an amount to be determined according to proof, with pre- and post-judgment interest at the highest rate permitted by law.

42. Appeldorn's fraudulent conduct was gross, wanton, willful and deliberately designed to injure Meritain, and Meritain is entitled to punitive damages in connection therewith in an amount to be determined according to proof.

**<u>THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>**
(Declaratory Relief)

43. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 42 as if set forth fully herein.

44. Following negotiations, Meritain and Appeldorn entered into an Agreement by which Meritain purchased AEI. In partial consideration of moneys received, Appeldorn agreed

to refrain from competing with Meritain and AEI in Arizona prior to July 30, 2015; soliciting and employing AEI employees prior to July 30, 2015; soliciting AEI and Meritain clients prior to July 30, 2015; disparaging AEI and Meritain at any time; and using and disclosing confidential and proprietary business information belonging to AEI at any time.

45. Just two years into the term of the five-year non-compete agreement, Defendants breached each of the aforesaid provisions and are directly and unfairly competing with Meritain and AEI. Meritain has a reasonable belief that Defendants will continue to breach the non-disparagement and non-compete provisions set forth in Section 7.3 of the Agreement.

46. By reason of the foregoing, a real and justiciable controversy exists between the parties, and Meritain is entitled to a declaration, that:

a. the Agreement is a valid and binding contract entered into between Meritain and Appeldorn; and

b. the Agreement prohibits Defendants from competing with Meritain and AEI in Arizona prior to July 30, 2015; soliciting and employing AEI employees prior to July 30, 2015; soliciting AEI and Meritain clients prior to July 30, 2015, including, but not limited to, ASBAIT; disparaging AEI and Meritain at any time; and using and disclosing confidential and proprietary business information belonging to AEI at any time.

**FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
(For A Preliminary And Permanent Injunction)

47. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 46 as if set forth fully herein.

48. Defendants' improper and unlawful breaches of contract, fraud and other wrongful acts threaten to continue to cause and will cause further immediate and irreparable injury to Meritain's business and goodwill, to client and employee relationships, to Meritain's standing and reputation in the industry, and to its own continuing relationships with its existing employees. Such injuries are substantial and cannot be remedied completely through compensatory damages.

49. Meritain is likely to succeed on the merits and has no adequate remedy at law. Defendants' misconduct to date also causes the equities to weigh heavily in favor of granting Meritain relief.

50. By reason of the foregoing, Meritain is entitled to injunctive relief sufficient to enjoin Defendants, their agents, servants, officers, directors, employees, contactors, successors and assigns, and all persons, firms, corporation or entities action under their direction, authority or control, and all persons acting in participation with any of them, from competing with Meritain and AEI in Arizona prior to July 30, 2015; soliciting and employing AEI employees prior to July 30, 2015; soliciting AEI and Meritain clients prior to July 30, 2015; disparaging AEI and Meritain at any time; and using and disclosing confidential and proprietary business information belonging to AEI at any time.

**FIFTH CAUSE OF ACTION AGAINST AEI-2**
(Aiding, Abetting And Inducing Breach of Contract)

51. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 50 as if set forth fully herein.

52. Upon information and belief, AEI-2 has knowingly aided and abetted, induced and encouraged Appeldorn to breach the Agreement with knowledge of the Agreement.

53. Defendants' numerous breaches of the Agreement have caused irreparable harm to Meritain, and are certain to imminently cause further irreparable harm if Defendants are not enjoined from further breaching the Agreement.

54. Defendants' numerous breaches have caused, and will imminently cause, monetary damage to Meritain in an amount to be determined according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Meritain prays for judgment in its favor and against Defendants as follows:

a. For a declaration that:

i) the Agreement is a valid and binding contract entered into between Meritain and Appeldorn; and

ii) the Agreement prohibits Defendants from competing with Meritain and AEI in Arizona prior to July 30, 2015; soliciting and employing AEI employees prior to July 30, 2015; soliciting AEI and Meritain clients prior to July 30, 2015, including, but not limited to, ASBAIT; disparaging AEI and Meritain at any time; and using and disclosing confidential and proprietary business information belonging to AEI at any time;

b. For an award to Meritain of its actual damages from Defendants' violation of the Agreement in an amount to be determined according to proof;

c. For temporary, preliminary and permanent injunctive relief enjoining Defendants, their agents, servants, officers, directors, employees, contactors, successors and assigns, and all persons, firms, corporation or entities action under their direction, authority or control, and all persons acting in participation with any of them, from competing with Meritain and AEI in Arizona prior to July 30, 2015; soliciting and employing AEI employees prior to July 30, 2015; soliciting AEI and Meritain clients prior to July 30, 2015; disparaging AEI and Meritain at any time; and using and disclosing confidential and proprietary business information belonging to AEI at any time;

d. For punitive damages; and

e. For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
October 18, 2012

LOEB & LOEB LLP

By: ______________________

Mark J. Goldberg
Mark A. Douglas
345 Park Avenue
New York, NY 10154
Telephone: 212.407.4000
Facsimile: 212.407.4990

Daniel A. Platt (*Pro Hac Vice – to be filed*)
Robert J. Catalano (*Pro Hac Vice – to be filed*)
Eric Schwartz (*Pro Hac Vice – to be filed*)
LOEB & LOEB LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA 90067
Telephone: 310.282.2000
Facsimile: 310.282-2200

*Attorneys for Plaintiff*
*Meritain Health, Inc.*

# EXHIBIT A

EXECUTION COPY

---

STOCK PURCHASE AGREEMENT

by and among

MERITAIN HEALTH, INC.
as Purchaser,

THE SELLERS PARTY HERETO

PRODIGY HEALTH GROUP, INC.
as Purchaser Guarantor
(only with respect to Section 7.10 hereof)

and

TRG HOLDINGS, LLC
as TRG Guarantor
(only with respect to Section 7.11 hereof)

---

Dated as of July 30, 2010

---

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....1

Section 1.1 Definitions ....1

ARTICLE II PURCHASED STOCK ....1

Section 2.1 Stock of the Company ....1

Section 2.2 Consideration ....2

Section 2.3 Closing Payment; ASBAIT Condition ....2

Section 2.4 Working Capital Adjustment ....4

ARTICLE III CLOSING ....7

Section 3.1 Closing ....7

Section 3.2 Deliveries by Sellers ....7

Section 3.3 Deliveries by Purchaser ....8

ARTICLE IV REPRESENTATIONS AND WARRANTS REGARDING THE SELLERS ....8

Section 4.1 Authority; Due Execution and Delivery ....8

Section 4.2 Non-Contravention ....9

Section 4.3 Consents and Approvals ....9

Section 4.4 Title; Company Shares ....9

ARTICLE V REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY ....10

Section 5.1 Organization and Qualification ....10

Section 5.2 Non-Contravention ....10

Section 5.3 Capitalization; Title ....10

Section 5.4 Financial Statements ....11

Section 5.5 Absence of Certain Changes or Events ....11

Section 5.6 Contracts ....13

Section 5.7 Compliance with Laws ....15

Section 5.8 Intellectual Property ....16

Section 5.9 Employee Benefit Plans; ERISA ....18

Section 5.10 Labor Matters ....19

Section 5.11 Title to Properties and Assets ....19

Section 5.12 Sufficiency of Assets ....20

**TABLE OF CONTENTS**
(Continued)

Page

Section 5.13 Litigation....20
Section 5.14 Taxes....20
Section 5.15 Environmental Matters....22
Section 5.16 Potential Conflicts of Interest....23
Section 5.17 Insurance Policies....23
Section 5.18 Accounts Receivable....24
Section 5.19 Broker's and Finder's Fees....24
Section 5.20 Disclosure....24
ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER....24
Section 6.1 Organization of Purchaser....24
Section 6.2 Authority; Due Execution and Delivery....24
Section 6.3 Non-Contravention....25
Section 6.4 Consents and Approvals....25
Section 6.5 Broker's and Finder's Fees....25
Section 6.6 Financial Wherewithal....25
Section 6.7 Disclosure....25
ARTICLE VII COVENANTS....26
Section 7.1 Reasonable Efforts; Certain Consents....26
Section 7.2 Post-Closing Access to Records....26
Section 7.3 Non-Competition; Non-Solicitation; Confidentiality....26
Section 7.4 Expenses....28
Section 7.5 Employee Matters....28
Section 7.6 Termination of Liens....29
Section 7.7 FIRPTA Certificate....29
Section 7.8 Further Assurances....29
Section 7.9 Conduct of Business During the ASBAIT Condition Period....29
Section 7.10 Guarantee of Purchaser's Obligations....30
Section 7.11 Guarantee of Sellers' Obligations....30

**TABLE OF CONTENTS**
(Continued)


Page

ARTICLE VIII INDEMNIFICATION ....................31
- Section 8.1 Survival of Representations and Warranties....................31
- Section 8.2 Indemnification of Purchaser....................31
- Section 8.3 Indemnification of Sellers....................32
- Section 8.4 Indemnification Procedure for Third Party Claims Against Indemnified Parties ....................33
- Section 8.5 Failure to Give Timely Third Party Indemnification Notice....................34
- Section 8.6 Notice of Non-Third Party Claims ....................34
- Section 8.7 Limitation on Indemnification....................35
- Section 8.8 Treatment of Indemnity Payments Between the Parties....................36
- Section 8.9 Right to Set-Off ....................36
- Section 8.10 Sole and Exclusive Remedy ....................36
- Section 8.11 Waiver of Contribution....................37

ARTICLE IX TAXES ....................37
- Section 9.1 Tax Returns....................37
- Section 9.2 Straddle Periods....................37
- Section 9.3 Transfer Taxes ....................37
- Section 9.4 Cooperation on Tax Matters....................38
- Section 9.5 Audits....................38
- Section 9.6 Tax-Sharing Agreements....................38
- Section 9.7 Elections ....................39

ARTICLE X MISCELLANEOUS....................39
- Section 10.1 Waivers and Consents; Amendments ....................39
- Section 10.2 Severability....................39
- Section 10.3 Public Disclosure....................40
- Section 10.4 Governing Law; Consent to Jurisdiction; Waiver of Jury Trial....................40
- Section 10.5 Notices ....................40
- Section 10.6 Counterparts....................42

**TABLE OF CONTENTS**
(Continued)

| | | Page |
|---|---|---|
| Section 10.7 | Assignments | 42 |
| Section 10.8 | Entire Agreement | 42 |
| Section 10.9 | Section Headings; Construction | 42 |
| Section 10.10 | Specific Performance | 43 |
| Section 10.11 | Third-Party Beneficiaries | 43 |
| Section 10.12 | Independent Counsel | 43 |

ANNEX A Definitions

EXHIBITS

Exhibit A Escrow Agreement
Exhibit B Release Agreement
Exhibit C Appeldorn Consulting Agreement
Exhibit D Transition Services Agreement

# STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT, dated as of July 30, 2010 (this "Agreement"), by and among Meritain Health, Inc., a New York corporation ("Purchaser"), TRG Healthcare, Inc., a Delaware corporation ("TRG"), and Leanne Appeldorn ("Appeldorn") (each a "Seller" and collectively, the "Sellers"), Prodigy Health Group, Inc., a Delaware corporation ("Purchaser Guarantor"), only with respect to Section 7.10 hereof, and TRG Holdings, LLC, a Delaware limited liability company ("TRG Guarantor"), only with respect to Section 7.11 hereof.

WHEREAS, the Sellers collectively own one hundred percent (100%) of the outstanding Equity Interests of Administrative Enterprises, Inc., an Arizona corporation ("AEI"), and Adminco, Inc., an Arizona corporation ("Adminco," and together with AEI, the "Company");

WHEREAS, the Company operates the business of providing third party claims administration services (such business, together with all other business conducted by the Company, collectively, the "Business"); and

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, Purchaser desires to purchase all of the Equity Interests of AEI and Adminco, and the Sellers desire to sell such Equity Interests to Purchaser, and enter into such agreements on the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1 Definitions. In addition to the terms that are otherwise defined in this Agreement, certain undefined capitalized terms used in this Agreement are used as defined in Annex A, which is incorporated herein by reference as if set forth in full in this Section 1.1.

## ARTICLE II

## PURCHASED STOCK

Section 2.1 Stock of the Company. Upon the terms and conditions of this Agreement, on the Closing Date (unless otherwise specified herein), each Seller shall sell, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, accept and receive, all of such Seller's right, title and interest in and to the Equity Interests of AEI and Adminco owned by such Seller (the aggregate of such Equity Interests, the "Purchased Stock"), free and clear of all Liens.

Section 2.2 Consideration.

(a) Upon the terms and subject to the conditions of this Agreement, in consideration of the sale, transfer, assignment and delivery of the Purchased Stock, Purchaser shall pay to the Sellers, in accordance with and subject to the terms of Section 2.3 hereof and the other terms of this Agreement, an aggregate amount equal to (A) THIRTEEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($13,500,000), *plus* (B) the SEP Reimbursement Amount, *plus* (C) the Closing Net Debt Amount Surplus, if any, *plus* (D) the Closing Working Capital Surplus, if any, *minus* (E) the Closing Net Debt Amount Shortfall, if any, *minus* (F) the Closing Working Capital Shortfall, if any, *minus* (G) the Transaction Expenses, if any (such aggregate amount, the "Purchase Price").

(b) Unless otherwise specifically provided herein, all payments with respect to the Purchase Price made to the Sellers shall be allocated pro rata between the Sellers as set forth on Schedule 2.2(b) (for each Seller, such allocation being its or her "Pro Rata Allocation").

Section 2.3 Closing Payment; ASBAIT Condition.

(a) Closing Payment. At the Closing, Purchaser shall disburse the Purchase Price to the payees (including each Seller) specified in a mutually agreed upon funds flow memorandum, reflecting the terms and conditions of this Agreement, to be agreed upon by the Sellers and Purchaser prior to the Closing (the "Funds Flow Memorandum"), by wire transfer of immediately available funds to the bank accounts designated for each payee in the Funds Flow Memorandum. Sellers agree that funds disbursed by Purchaser in accordance with the terms of the Funds Flow Memorandum shall be deemed fully paid hereunder for all purposes.

(b) Certain Definitions. As used herein the following terms shall have the meanings specified below:

(i) "Administrative Service Agreement" means the administration services agreement, dated July 1, 1999, between ASBAIT and AEI, as amended from time to time.

(ii) "ASBAIT" means the Arizona School Boards Association Insurance Trust.

(iii) "ASBAIT Employee Lives" means 26,000.

(iv) "ASBAIT PEPM Decline" means, in the case of an ASBAIT Repricing Event, an amount equal to $15.10 *minus* the sum of (A) the cumulative per employee per month pricing in the Administrative Service Agreement for medical administrative services provided by AEI, COBRA/HIPPA administrative services provided by AEI, and administrative services provided by Adminco, in each case applicable for the plan year beginning July 1, 2011 (or in any amendment to, extension of, or replacement of the Administrative Service Agreement effected between ASBAIT and Purchaser or any of its Affiliates (including the Company) for the plan year

beginning July 1, 2011) *plus* (B) the cumulative per employee per month pricing in the Program Administration Agreement for the plan year beginning July 1, 2011 (or in any amendment to, extension of, or replacement of the Program Administration Agreement effected between ASBAIT and Purchaser or any of its Affiliates (including the Company) for the plan year beginning July 1, 2011).

(v) "ASBAIT Reimbursement Amount" means an amount equal to the product of (A) the ASBAIT Employee Lives *multiplied* by (B) the ASBAIT PEPM Decline *multiplied* by (C) twelve (12); *provided, however*, in no event shall the ASBAIT Reimbursement Amount exceed $500,000.

(vi) "ASBAIT Repricing Event" means any decrease by ASBAIT in the per employee per month pricing set forth in the Administrative Service Agreement or the Program Administration Agreement as a condition to its renewal of either such agreement for the plan year beginning July 1, 2011.

(vii) "ASBAIT Termination Event" means the termination of, or giving of notice of termination of, the Administrative Service Agreement or the Program Administration Agreement by ASBAIT; *provided, however*, the Parties agree and acknowledge that for purposes of this definition, any amendment, extension or replacement of the Administrative Service Agreement or the Program Administration Agreement, as applicable, by or with Purchaser or any of its Affiliates (including the Company), shall not be deemed an ASBAIT Termination Event.

(viii) "Program Administration Agreement" means the administration services agreement, dated July 1, 1999, between ASBAIT and Adminco, as amended from time to time.

(c) ASBAIT Condition. At the Closing, the Sellers shall disburse an aggregate amount equal to FIVE HUNDRED THOUSAND DOLLARS ($500,000) (the "Escrow Funds") by wire transfer of immediately available funds to an account designated in writing by JP Morgan Chase Bank N.A., in its capacity as escrow agent (the "Escrow Agent") under the Escrow Agreement to be entered into on the date hereof among Purchaser, the Sellers and the Escrow Agent substantially in the form of Exhibit A to this Agreement (the "Escrow Agreement"). If, as of May 3, 2011 (the "Escrow Release Date"), neither an ASBAIT Termination Event nor an ASBAIT Repricing Event has occurred, then the Escrow Agent shall promptly (and in any event not later than 5 business days after the Escrow Release Date) disburse the Escrow Funds to the Sellers pursuant to the Escrow Agreement, together with any accumulated interest thereon. If, as of the Escrow Release Date, an ASBAIT Termination Event has occurred, then the Escrow Agent shall promptly (and in any event not later than 5 business days after the Escrow Release Date) disburse the Escrow Funds to Purchaser, together with any accumulated interest thereon. If, as of the Escrow Release Date, an ASBAIT Repricing Event has occurred, then the Escrow Agent shall promptly (and in any event not later than 5 business days after the Escrow Release Date) disburse, pursuant to the Escrow Agreement: (x) a portion of the Escrow Funds equal to the ASBAIT Reimbursement Amount to Purchaser, together with any interest accumulated on such portion of the Escrow Funds; and (y)

the remainder of the Escrow Funds, if any, to the Sellers, together with any interest accumulated on such remainder of the Escrow Funds.

(d) ASBAIT Information Covenants.

(i) During 2010, Purchaser will, within 10 days of the end of each calendar quarter, deliver to the Sellers a report setting forth the revenue, pricing and number of employee lives applicable to ASBAIT during such quarterly period under the Administrative Service Agreement and the Program Administration Agreement.

(ii) During 2011 until the Escrow Amount has been distributed in full, Purchaser will, within 10 days of the end of each month, deliver to the Sellers a report setting forth the revenue, pricing and number of employee lives applicable to ASBAIT during such monthly period under the Administrative Service Agreement and the Program Administration Agreement.

(iii) Until the Escrow Amount has been distributed in full in accordance with the terms of this Agreement and the Escrow Agreement, within 5 days of any change in pricing under the Administrative Service Agreement and/or the Program Administration Agreement, Purchaser will notify the Sellers in writing of such change.

Section 2.4 Working Capital Adjustment.

(a) Attached hereto as Schedule 2.4(a) is a statement (the "Estimated Working Capital Statement") prepared on the same basis and in a manner consistent with the Financial Statements, except as otherwise noted in the footnotes on Schedule 2.4(a), setting forth an estimate of the Working Capital as of the Closing Date (the "Estimated Working Capital").

(b) As soon as practicable, but in no event later than forty-five (45) calendar days after the Closing, Purchaser shall prepare and deliver to the Sellers a statement (the "Actual Working Capital Statement"), prepared on the same basis and in a manner consistent with the Estimated Working Capital Statement, setting forth its calculation of the Working Capital as of the Closing Date (the "Actual Working Capital"). The Actual Working Capital Statement shall be accompanied by a certificate signed by an officer of Purchaser that the Actual Working Capital Statement is true and correct in all material respects.

(c) The Sellers may dispute the Actual Working Capital Statement, but only on the basis that (i) there has been an error in the calculations set forth therein, (ii) the figures used in such calculations are not derived from the applicable financial statements or books and records of the Company or (iii) the amounts and/or calculations contained therein were not calculated in accordance with the terms of this Agreement, in each case by providing written notice to Purchaser within twenty (20) calendar days of the Sellers receipt of the Actual Working Capital Statement (such date, the "Dispute Notice Date") of such dispute setting forth the nature of the dispute and specifying, in reasonable detail, those items, amounts or calculations as to which it disagrees and the reasons therefore (a "Working Capital Dispute

Notice"). During such twenty (20) calendar day period, the Sellers may examine, during normal business hours, such books, records and accounts of the Company as reasonably necessary to verify the accuracy of the Actual Working Capital Statement. The failure of the Sellers to provide Purchaser the Working Capital Dispute Notice within such twenty (20) day period shall constitute acceptance by the Sellers of the computations reflected in the Actual Working Capital Statement. The Actual Working Capital Statement shall become the "Final Working Capital Statement" and the matters set forth in the Working Capital Statement will be deemed, absent manifest error, to be final, conclusive and binding upon Purchaser and the Sellers, upon the earlier of (i) failure of the Sellers to provide Purchaser a Working Capital Dispute Notice within the prescribed twenty (20) day period; (ii) delivery to Purchaser of a written notice from the Sellers waiving such right to so object; (iii) mutual written agreement of Purchaser and the Sellers resolving any disputed calculations; or (iv) the Dispute Accountant's final determination (as described below).

(d) If the Sellers deliver a Working Capital Dispute Notice to Purchaser within the prescribed twenty (20) day period, Purchaser and the Sellers shall use reasonable efforts to reach agreement on the disputed items, amounts or calculations within twenty (20) calendar days. If Purchaser and the Sellers are able to reach agreement on the disputed items within such twenty (20) day period, the agreed upon terms will be deemed, absent manifest error, to be final, conclusive and binding upon Purchaser and the Sellers. If Purchaser and the Sellers do not resolve all disputed items, amounts or calculations set forth in a Working Capital Dispute Notice within twenty (20) days after delivery of such Working Capital Dispute Notice, the remaining disputed items and amounts shall be submitted to the Dispute Accountant for resolution of such disputed items in accordance with the procedures set forth in Section 2.4(e).

(e) Within twenty (20) days following appointment of a Dispute Accountant, if applicable, Purchaser and the Sellers will each submit to the Dispute Accountant a written statement setting forth in reasonable detail their respective positions with respect only to the disputed matters set forth in the Working Capital Dispute Notice and which remain disputed as of the date of such appointment (the "Unresolved Working Capital Disputes"). Purchaser and the Sellers will furnish to the Dispute Accountant such work papers and other documents and information relating to the Unresolved Working Capital Disputes as the Dispute Accountant may reasonably request and are available to such party (or its independent public accountants). Purchaser and the Sellers will have the opportunity to present their positions with respect to such Unresolved Working Capital Disputes to the Dispute Accountant, and such Unresolved Working Capital Disputes shall be resolved by the Dispute Accountant in accordance with the requirements of this Section 2.4(e). The Dispute Accountant shall prepare a written report setting forth the resolution of such Unresolved Working Capital Disputes and calculating the revised amount of any portion, if applicable, of the Unresolved Working Capital Disputes, which report shall be delivered to each of Purchaser and the Sellers promptly, but in no event later than twenty (20) days after such Unresolved Working Capital Disputes are submitted to the Dispute Accountant. Such resolution shall not reflect any difference from any amount set forth in the Actual Working Capital Statement other than differences required to resolve the Unresolved Working Capital Disputes submitted to the Dispute Accountant. In resolving any individual Unresolved Working Capital Dispute, the Dispute Accountant may not assign a dollar amount or value to any amount that is greater than the greatest amount or value, or less than the lowest amount or value, proposed either by Purchaser or the Sellers in their

written statements submitted to the Dispute Accountant. The revised amount, if applicable, of the items set forth in the Dispute Accountant's written report shall be, absent manifest error, final, conclusive and binding upon Purchaser and the Sellers, and shall not be, absent manifest error, subject to appeal of any kind. The fees and disbursements of the Dispute Accountant shall be allocated between Purchaser, on the one hand, and the Sellers, on the other hand, such that the Sellers' share of such fees and disbursements shall be in the same proportion that the aggregate amount of the Unresolved Working Capital Disputes submitted by the Sellers to the Dispute Accountant that are unsuccessfully disputed by Sellers (as finally determined by the Dispute Accountant) bears to the total amount of such Unresolved Working Capital Disputes so submitted by the Sellers to the Dispute Accountant. Each of Purchaser and the Sellers shall execute a reasonably acceptable engagement letter, if requested to do so by the Dispute Accountant, and shall provide the Dispute Accountant with reasonable access to their respective officers or employees (or other appropriate persons) who are responsible for financial matters and, where applicable, to the books and records of Purchaser, the Company and Seller.

(f) If the Final Working Capital is less than the Estimated Working Capital, then the Sellers, in accordance with their respective Pro Rata Allocations, shall by wire transfer of immediately available funds to a bank account designated by Purchaser pay to Purchaser an amount equal to the difference between the Final Working Capital and the Estimated Working Capital within three (3) Business Days following the determination thereof.

(g) If the Final Working Capital is greater than the Estimated Working Capital, then Purchaser shall pay to each Seller, by wire transfer of immediately available funds to the bank account for such Seller in the Funds Flow Memorandum, its or her Pro Rata Allocation of the difference between the Final Working Capital and the Estimated Working Capital within three (3) Business Days following the determination thereof; provided, however, that in no event shall Purchaser be required to pay to the Sellers an amount under this Section 2.4(g), if any, in excess of the amount of cash available at the Company (excluding cash, if any, held on behalf of customers of the Company) immediately following the Closing.

(h) Definitions relating to Working Capital Adjustment:

(i) "Closing Working Capital Shortfall" means the amount, if any, equal to the extent the Estimated Working Capital is less than the Working Capital Target.

(ii) "Closing Working Capital Surplus" means the amount, if any, equal to the extent the Estimated Working Capital exceeds the Working Capital Target.

(iii) "Current Assets" means the current assets of the Company as of the Closing Date, as determined on a consolidated basis consistent with the Financial Statements, including, without limitation, prepaid expenses and accounts receivable (net of reserves), but excluding (x) any deferred tax assets, (y) any prepaid expenses reflecting the SEP Reimbursement Amount and (z) any cash or cash equivalents in excess of $125,000.

(iv) "Current Liabilities" means the current liabilities of the Company as of the Closing Date, as determined on a consolidated basis consistent with the Financial Statements, including, without limitation, accounts payable, rebates owed, accrued salaries, wages, bonuses and commissions, vacation, sick or severance pay, but excluding (w) the Company's Debt, (x) any deferred tax liabilities, (y) any deferred rent, and (z) and deferred revenues.

(v) "Final Working Capital" means: (A) the Actual Working Capital as reflected on the Actual Working Capital Statement in the event Sellers do not timely submit a Working Capital Dispute Notice in accordance with Section 2.4(c); (B) the final Actual Working Capital as mutually agreed in writing by Purchaser and the Sellers; or (C) the final Actual Working Capital as determined by the Dispute Accountant.

(vi) "Working Capital" means Current Assets *minus* Current Liabilities.

**ARTICLE III**

**CLOSING**

Section 3.1 Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place concurrently with the execution hereof at the offices of Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036, at 10:00 a.m. local time or at such other place, date and/or time as Purchaser and the Sellers mutually agree (such date being the "Closing Date").

Section 3.2 Deliveries by Sellers. At the Closing, the Sellers shall deliver, or cause to be delivered, to Purchaser each of the following, duly executed by or on behalf of each Seller (or such other Persons as indicated), as applicable:

(a) the certificates, if any, delivered to Purchaser that evidence the Purchased Stock, accompanied by instruments of transfer or assignment endorsed in blank dated as of the Closing Date;

(b) such other instruments of conveyance as shall, in the reasonable opinion of Purchaser and its counsel, be necessary to vest in Purchaser good, valid and marketable title to the Purchased Stock;

(c) executed termination statements or releases for any UCC financing statements covering the assets and properties of the Company;

(d) certifications by each of the Sellers of non-foreign status prepared in accordance with Treasury Regulation Section 1.1445-2 and Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code") dated as of the Closing Date;

(e) a certificate of the Secretary of State of the State of Arizona, dated no earlier than five (5) days prior to the Closing Date, certifying as to the good standing and non-delinquent franchise tax status of each of AEI and Adminco;

(f) evidence, in form and substance satisfactory to Purchaser, that any indebtedness for borrowed money has been repaid in full by AEI or Adminco, as applicable, prior to or concurrently with the Closing;

(g) the Escrow Agreement duly executed by each of the Sellers;

(h) a release in favor of the Company and Purchaser from each of the Releasing Holders, substantially in the form of Exhibit B hereto (the "Release Agreements"), duly executed by each of the Releasing Holders;

(i) a consulting agreement between Purchaser and Appeldorn, substantially in the form of Exhibit C hereto (the "Appeldorn Consulting Agreement"), duly executed by Leanne Appeldorn;

(j) a transition services agreement between Purchaser and TRG, substantially in the form of Exhibit D hereto (the "Transition Services Agreement"), duly executed by TRG;

(k) written resignations, effective as of the Closing, of all of the officers and all of the directors of each of AEI and Adminco;

(l) copies of the resolutions and other documents required to be delivered pursuant to Section 7.5(b); and

(m) any other documents required to be delivered at Closing by either Seller as provided in this Agreement.

Section 3.3 Deliveries by Purchaser. At the Closing, Purchaser shall deliver or cause to be delivered to the Sellers each of the following, duly executed by or on behalf of Purchaser (or such other Person as indicated):

(a) an aggregate amount equal to the Purchase Price, payable as described in Section 2.3(a), by wire transfer of immediately available funds;

(b) the Escrow Agreement duly executed on behalf of Purchaser and the Escrow Agent;

(c) the Appeldorn Consulting Agreement, duly executed by Purchaser;

(d) the Transition Services Agreement, duly executed by Purchaser; and

(e) any other documents required to be delivered at Closing by Purchaser as provided in this Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTS REGARDING THE SELLERS

Each Seller severally as to itself and not jointly represents and warrants to Purchaser, except as noted in the Schedules hereto, as of the Closing Date as follows:

Section 4.1 Authority; Due Execution and Delivery. Such Seller has full capacity, legal right, power and authority required to execute, deliver and perform her or its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to perform her or its obligations hereunder or thereunder and to consummate the transactions contemplated hereby or thereby. This Agreement and the other Transaction Documents have been duly authorized (with respect to TRG), executed and delivered by such Seller (to the extent a party thereto), and constitute the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by (a) bankruptcy, insolvency and other similar laws affecting creditors' rights generally and (b) general principles of equity. TRG is a corporation that has been duly created and is validly existing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and assets.

Section 4.2 Non-Contravention. Except as set forth on Schedule 4.2, the execution and delivery of this Agreement and the other Transaction Documents by such Seller (to the extent a party thereto), and the performance by such Seller of her or its obligations hereunder and thereunder, and the consummation by such Seller of the transactions contemplated hereby and thereby in accordance with their respective terms does not (a) violate, conflict with or result in a breach of any provision of the certificate of incorporation, articles of incorporation, or bylaws (or similar organizational or governing documents) of TRG, (b) violate, conflict with or result in the breach of any material provision of, or result in a material modification of or otherwise entitle any party to terminate, or constitute (whether after the filing of notice or lapse of time or both) a default under any Contract to which such Seller is a party or by or to which such Seller or any of her or its respective assets or properties may be bound or subject, (c) result in the creation or imposition of any Lien upon the properties or assets of such Seller, or (d) result in the revocation of any Permit, or violate in any material respect any Law or Order applicable to, against, or binding upon, such Seller or by which the businesses or properties of such Seller are bound.

Section 4.3 Consents and Approvals. Except as set forth on Schedule 4.3, the execution and delivery of this Agreement and the other Transaction Documents to which such Seller is a party, the consummation by such Seller of the transactions contemplated hereby or thereby, or the performance by such Seller of the obligations hereunder or thereunder, will not require any consent, approval, order, license, waiver, authorization or action of, or any filing, registration or declaration with notice to (each of the foregoing, a "Consent"), any Governmental Body or any other Person and no lapse of a waiting period under any Law or Order is necessary or required in connection with the foregoing clauses.

Section 4.4 Title; Company Shares. Except as set forth in Schedule 4.4, such Seller is the sole legal record and beneficial owner of, and has good and valid title to, the capital stock

of AEI and Adminco as set forth opposite the name of such Seller on Schedule 5.3 hereof, free and clear of all Liens, and such good and valid title will be transferred to Purchaser on the Closing Date, free and clear of all Liens. Such Seller is not a party to any option, warrant, purchase right, or other Contract or commitment that could require such Seller to sell, transfer, or otherwise dispose of any shares of capital stock of the Company (other than this Agreement) or the other Transaction Documents). Such Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any shares of capital stock of the Company. Such Seller holds her or its shares of capital stock of the Company in her or its individual name, and none of such shares require any spousal consent for the transfer thereof in connection with the transactions contemplated hereby.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

The Sellers represent and warrant to Purchaser, except as noted in the Schedules hereto, as of the Closing Date as follows:

Section 5.1 Organization and Qualification. AEI and Adminco is each a corporation duly formed, validly existing and in good standing under the laws of the state of Arizona, and each has, in all material respects, all requisite power and authority to own, lease and operate its respective properties and assets and to carry on the Business as now being conducted or heretofore conducted. Each of AEI and Adminco are, in all material respects,, duly qualified to do business as a foreign company and are in good standing in each jurisdiction in which the ownership or leasing of its respective property or the conduct of the Business requires such qualification. The Sellers have delivered to Purchaser true, correct and complete copies of the articles of organization, articles of incorporation, or bylaws (or similar organizational or governing documents) of AEI and Adminco, if any, together with true, correct and complete copies of all amendments and modifications thereto and waivers therefrom.

Section 5.2 Non-Contravention. The execution and delivery of this Agreement and the other Transaction Documents by each of the Sellers, and the performance by each of the Sellers of its or her obligations hereunder and thereunder, and the consummation by the Sellers of the transactions contemplated hereby and thereby in accordance with their respective terms will not (a) violate, conflict with or result in a breach of any provision of the Company's or any Seller's (if applicable) articles of organization, articles of incorporation, or bylaws (or similar organizational or governing documents), (b) except as set forth on Schedule 5.2(b), violate, conflict with or result in the breach of any material provision of, or result in a material modification of or otherwise entitle any party to terminate, or constitute (whether after the filing of notice or lapse of time or both) a default under any Contract to which the Company is a party or by or to which the Company or any of its assets or properties may be bound or subject, (c) result in the creation or imposition of any Lien upon the properties or assets of the Company or (d) result in the revocation of any Permit, or violate in any material respect any Law or Order applicable to, against, or binding upon, the Company or by which the Business or the Company's assets or properties are bound.

Section 5.3 Capitalization; Title. Schedule 5.3 accurately sets forth all of the authorized, issued and outstanding capital stock of AEI and Adminco and lists the name of, and number of shares of capital stock held by the Sellers. All of the issued and outstanding capital stock of each of AEI and Adminco have been duly authorized, validly issued and in compliance with applicable securities and other laws, and are fully paid and nonassessable. Except as set forth on Schedule 5.3 hereof, and subject to the effectiveness of the Release Agreements, there are no outstanding subscriptions, options, warrants, rights, pledges, calls, puts, arrangements, conversion securities or rights, or Contracts of any kind relating to the purchase, sale, transfer, pledge or other disposition of, or the voting or registration of, or the issuance or sale of any capital stock of AEI or Adminco (including any securities convertible into or exercisable or exchangeable for such capital stock of AEI or Adminco). There are no statutory or contractual preemptive rights or rights of first offer or refusal or similar rights with respect to the capital stock of AEI or Adminco, and there are no declared and unpaid dividends or distributions on any shares of capital stock of AEI or Adminco. Neither AEI nor Adminco owns or holds of record and/or beneficially any Equity Interest in any Person.

Section 5.4 Financial Statements.

(a) Schedule 5.4(a) sets forth a true and complete copy of: (i) the reviewed balance sheet of the Company as of June 30, 2009 and the related statements of income, changes in stockholders' equity and cash flows for the fiscal year ended June 30, 2009 (the "Annual Financials"); and (ii) the unaudited balance sheet of the Company as of February 28, 2010 and the related statement of income for the eight (8) months ended February 28, 2010 (the "Interim Financials," and, together with the Annual Financials, collectively, the "Financial Statements"). Except as set forth in Schedule 5.4(a), all such Financial Statements and notes are complete and accurate in all material respects and (subject to the absence of footnotes and to year end adjustments with respect to the Interim Financials) fairly present the financial position of the Company as of the respective dates thereof, and the results of operations for the periods therein referred to, in each case in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis.

(b) The Company does not have any Liabilities, except (i) Liabilities incurred since February 28, 2010 in the Ordinary Course of Business, (ii) Liabilities incurred since February 28, 2010 under a Contract to which the Company is a party (other than any Liabilities relating to any breach, violation or default or alleged breach, violation or default thereof, none of which are materially adverse to the Company, taken as a whole), (iii) as and to the extent disclosed on the face of the balance sheet of the Company as of February 28, 2010, or (iv) as set forth on Schedule 5.4(b).

Section 5.5 Absence of Certain Changes or Events. Since February 28, 2010, the Company has conducted the Business in the Ordinary Course of Business and there has not been any adverse change in the business, assets, condition (financial or otherwise), cash flows or results of operations of the Company or the Business, except such changes in the Ordinary Course of Business, none of which, individually or in the aggregate, has been or is reasonably likely to be materially adverse to the business, assets, condition (financial or otherwise), cash flows or results of operations of the Company or the Business. Without limiting the generality

of the foregoing sentence, since February 28, 2010 and except as disclosed on Schedule 5.5, the Company has not:

(a) (i) made or contracted for any capital expenditures in excess of $10,000 per item and $50,000 in the aggregate, or (ii) made any other commitments or disbursements, incurred or paid any Liabilities or entered into any transactions in excess of $10,000 per item and $50,000 in the aggregate, except (x) in the Ordinary Course of Business, (y) expenses incurred in connection with the transactions contemplated by this Agreement or reflected as Current Liabilities in the Final Working Capital Statement and (z) distributions, dividends and payments in cash to the Company's stockholders declared and fully paid prior to the Closing or at the Closing in accordance with the Funds Flow Memorandum (which amounts paid as described in this clause (z) shall not constitute for any other purposes hereunder unrestricted cash of the Company at Closing or as of the Closing Date);

(b) sold, leased, abandoned, dedicated to public domain, surrendered, encumbered or otherwise transferred (or agreed to do any of the foregoing) any material assets or properties, or mortgaged, pledged or subjected to any Lien any of the material properties or assets of the Company;

(c) suffered any material damage, destruction or loss, whether or not covered by insurance, materially adversely affecting the properties of the Company or the Business;

(d) cancelled, settled, released or waived any right that is material to the Company or the operation of the Business, or any material debt owed to the Company;

(e) suffered any materially adverse change or any threat of any materially adverse change in its relations with or any loss or threat of loss of, any of its Material Suppliers or Material Customers, and to the Sellers' Knowledge, no Material Supplier or Material Customer intends to cancel, otherwise terminate or materially modify its relationship with the Company nor will the consummation of the transactions contemplated by this Agreement be materially adverse to the Company's relationship with any Material Supplier or Material Customer;

(f) made any change in the financial or tax accounting methods or practices or made any change in depreciation or amortization policies or lives adopted by it;

(g) (i) made any changes to its practice (including the timing thereof) of collecting of accounts receivable or discharging accounts payable including (x) any acceleration of collections or receivables (including through the use of discounts for early payment, requests for early payment or otherwise) and (y) any failure to pay payables when due or delay payments of payables compared to past practices (including continuation of past practices with respect to early payments of payables to obtain the benefits of any payment discounts) or (ii) otherwise failed to manage its working capital substantially in accordance with past practice;

(h) acquired, by merger, consolidation, acquisition of Equity Interests or assets, or otherwise, or made any investment in (whether by purchase of stock or securities,

contributions to capital, property transfers, or entering into binding agreements with respect to any such investment) any Person or business or division thereof;

(i) adopted a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization;

(j) declared, paid or set aside for payment any dividends or distributions with respect to the capital stock of AEI or Adminco, or otherwise made any payments to any Seller or any of their respective Affiliates, except (i) as set forth on Schedule 5.5(j), (ii) cash dividends fully paid prior to the Closing, and (iii) such cash dividends, tax liabilities, management fees, global services payments, expense reimbursements and bonuses paid prior to Closing or set aside for payment to the Sellers, and actually paid to the Sellers, at Closing as set forth on the Funds Flow Memorandum (which amounts paid shall not constitute for any other purposes hereunder unrestricted cash of the Company at Closing or as of the Closing Date);

(k) entered into any collective bargaining agreements;

(l) materially amended its charter or other organizational documents;

(m) entered into, terminated or modified in any materially adverse respect any material Contract;

(n) made, changed or rescinded any material Tax election, filed any amended Tax Return not required by Law, entered into any closing Contract relating to Taxes, waived or extended the statute of limitations in respect of Taxes, or settled or compromised any material Tax liability, or surrendered any right or claim for a Tax refund; or

(o) agreed, whether in writing or otherwise, to take any action described in this Section 5.5.

Section 5.6 Contracts.

(a) All of the Contracts to which the Company is a party or by which the Company or any of the assets of the Company may be bound or subject (collectively, the "Company Contracts") which are in the categories listed below are set forth on Schedule 5.6(a) hereto:

(i) Contracts with Material Customers;

(ii) Contracts with Material Suppliers;

(iii) Contracts related to Leased Real Property;

(iv) Contracts containing covenants of the Company not to compete in any line of business or with any Person in any geographical area or covenants of any other Person not to compete with the Company in any line of business or in any geographical area;

(v) Contracts with any current or former officer, director, employee (for employment or any other Contract), consultant, Affiliate, agent or other representative of the Company or with an entity in which any of the foregoing is a contracting Person;

(vi) Contracts for the sale of, or the purchase of, or options for the right to purchase, any of its assets or properties, and Contracts to license or sublicense any Intellectual Property;

(vii) Contracts for any capital expenditures;

(viii) Contracts relating to joint ventures, partnerships or similar arrangements to share profits;

(ix) Contracts under which the Company agrees to indemnify any Person or to share Tax liability of any Person;

(x) Contracts for any mortgages, indentures, security agreements or other agreements and instruments, or otherwise relating to the borrowing of money, including guarantees, the extension of credit or the granting of Liens;

(xi) Contracts with any Governmental Body (other than contracts with Governmental Bodies that are customers);

(xii) Contracts with any labor union or association representing any employee;

(xiii) any Contract dated on or after June 1, 2007 concerning or affecting the capital stock of AEI or Adminco;

(xiv) any Contract regarding any Debt or Liens with respect to the assets or properties of the Company; and

(xv) Contracts which are otherwise material to the Company and not previously listed as set forth above.

True and complete copies of all of the foregoing Contracts and other documents listed in (i)-(xv) above, in each case as amended to date, have been delivered to Purchaser, or in the case of such Contracts which are oral Contracts, an accurate written summary of the terms thereof have been delivered to Purchaser.

(b) All of the Company Contracts have been duly executed and delivered by the parties thereto (except for those Company Contracts set forth on Schedule 5.6(b)) and all of the Company's Contracts (including those listed on Schedule 5.6(b)) constitute legal, valid and binding obligations of the Company (and, to the Knowledge of the Sellers, each other party thereto), are in full force and effect, and are valid, binding and enforceable against the Company (and, to the Knowledge of the Sellers, each of the parties

thereto) in accordance with their respective terms except as enforcement may be limited by (i) bankruptcy, insolvency and other similar laws affecting creditors' rights generally and (ii) general principles of equity. The Company is not in material violation, breach of or default under any of such Company Contracts, nor does any condition exist that, with notice or lapse of time or both, would constitute a material default of the Company thereunder. To the Knowledge of Sellers, (i) no other party to any Company Contract has materially breached such Contract or is in material default thereunder, and (ii) no condition exists with respect to that party that with notice or lapse of time or both would constitute a material breach or default thereunder. No Seller has any Knowledge that any Person intends to terminate (whether for cause or otherwise), breach, default or materially decrease or limit its purchase of services under any Company Contracts.

Section 5.7 Compliance with Laws.

(a) The Company has all permits, accreditations, authorizations, licenses, orders, registrations and approvals of, and has made all required registrations with (collectively, "Permits"), each Governmental Body which are material to or necessary to carry on the Business as presently conducted (including the properties or assets of the Company). Such Permits are in full force and effect; no material violations are or have been recorded in respect of any Permit; no claim to revoke, amend, suspend or modify such Permits have been made or, to the Sellers' Knowledge, threatened; and no proceeding is pending or, to the Knowledge of Sellers, threatened to revoke or materially limit any Permit. The Company is in compliance in all material respects with the terms of such Permits. The Business is being conducted in compliance, in all material respects, with all Laws applicable to the assets or operations of the Company and the Company has filed with the proper authorities all material statements and reports required by all applicable Laws. The Company is in material compliance with all Laws, and is not in material violation of or material default under any Laws. The Company has not made any illegal payment to officers or employees of any Governmental Bodies or made any illegal payment or given any other illegal consideration to purchasing agents or other representatives of customers.

(b) The Company is in compliance with, and is not in violation of, any Laws regarding the receipt and disclosure of fees or other payments from customers related to any services provided by the Company to its customers.

(c) Neither the Company, nor to the Sellers' Knowledge, any Company Affiliate, director, officer, employee or agent has, directly or indirectly, offered to pay to or solicited any remuneration from, in cash, property or in kind, or made any financial arrangements with any customer, supplier, contractor, or third party in order to induce or directly or indirectly obtain business or payments from such Person, including any activities which are prohibited under 42 U.S.C. Sec 1320a-7, 1320a-7a or 1320a-7b or any regulations promulgated thereunder, or any related or similar state or local statutes or regulations.

(d) The Company has presently in effect an employee handbook, a true and complete copy of which has been provided to Purchaser. To the Sellers' Knowledge, no employee of the Company has committed any dishonest act that has caused funds of any customers of the Company to be misapplied, or misdirected or misused.

(e) The Company is in compliance in all material respects with its obligations under all Business Associate agreements (as defined under HIPAA) to which it is a party.

(f) The Company has delivered, or made available to Purchaser, true, complete and correct copies of all correspondence (other than immaterial correspondence) it has sent to or received in the past 12 months from the United States Department of Health and Human Services, and/or Office of Inspector General of the U.S. Department of Health and Human Services, any State Department of Health or Insurance or state Governmental Body that regulates any aspect of the Business, concerning disputes with, payment reviews by, audits by or settlement with such entities regarding alleged violation of any reimbursement, claims processing, licensure or other Laws applicable to the Company for its business and operations.

(g) To the Company's Knowledge, the Company is in compliance in all material respects with HIPAA and comparable state and federal Laws.

(h) The Company has not acted as an insurer and has not taken insurance risk or acted as a fiduciary for any self-funded benefit plans on behalf of any employer customers.

Section 5.8 Intellectual Property.

(a) Schedule 5.8(a) sets forth all United States and foreign patents and patent applications, trademark and service mark registrations and applications, and copyright registrations and applications owned by the Company, specifying as to each item, as applicable: (i) the nature of the item, including the title; (ii) the owner of the item; (iii) the jurisdictions in which the item is issued or registered or in which an application for issuance or registration has been filed; and (iv) the issuance, registration or application numbers and dates.

(b) Schedule 5.8(b) sets forth all IP Licenses, other than Software used by the Company that is commercially available pursuant to "shrink-wrap," "click-through," or other standard form license agreements. Schedule 5.8(b) does not contain a list of Software that is embedded as part of commercially available products, services or other items.

(c) Except as set forth on Schedule 5.8(c), the Company owns, is licensed under or otherwise has the right to use in the Business, free and clear of all Liens, all Intellectual Property.

(d) The Company has substantially performed all material obligations imposed on the Company in the IP Licenses, has made all payments required to date, and is not, nor to Sellers' Knowledge is another party thereto, in material breach or default thereunder in any respect, nor is there any event which with notice or lapse of time or both would constitute a material breach thereof or default thereunder.

(e) All registrations for Copyrights, Patents and Trademarks are in full force and effect, and all applications to register any Copyrights, Patents or Trademarks are pending and in good standing, all without challenge of any kind, to the Sellers' Knowledge.

(f) To the Sellers' Knowledge, there is no current event or circumstance which would materially impair the validity or enforceability of the Intellectual Property. No claim or action is pending or, to the Sellers' Knowledge, threatened and the Sellers have no Knowledge of any basis for any claim that challenges the validity, enforceability, ownership, or right to use, sell, license or sublicense (except for limitations in an IP License) any Intellectual Property, and no item of Intellectual Property is subject to any outstanding order, ruling, decree, stipulation, charge or agreement restricting in any manner the use, the licensing, or the sublicensing (except for limitations in an IP License) thereof.

(g) The Company has not received any notice, and has no Knowledge, that it has infringed upon or otherwise violated the intellectual property rights of third parties and has not received any claim, charge, complaint, demand or notice alleging any such infringement or violation, and has no Knowledge of any basis for any such claim.

(h) To the Sellers' Knowledge, no third party is infringing upon or otherwise violating any Intellectual Property.

(i) The Company has taken all commercially reasonable actions to maintain and protect the Intellectual Property, including the protection of Trade Secrets included therein from unauthorized use or disclosure.

(j) Except as disclosed in Schedule 5.8(j), as of the date hereof, each employee, officer, consultant or any other Person who developed any part of any Intellectual Property, either: (i) is a party to an agreement that conveys or obligates such person to convey to the Company any and all right, title and interest in and to all Intellectual Property developed by such Person in connection with such Person's employment with or engagement on behalf of the Company; (ii) as to copyrighted or copyrightable material created in the course of such Person's employment with or engagement on behalf of the Company, is a party to a "work made for hire" or other assignment agreement pursuant to which the Company owns or is deemed to be the original owners/authors of all proprietary rights in such material; or (iii) otherwise has by operation of Law vested in the Company any and all right, title and interest in and to all such Intellectual Property developed by such Person in connection with such Person's employment with, or engagement on behalf of, the Company.

(k) The consummation of the transactions contemplated by this Agreement or the Transaction Documents will not result in the loss or impairment of the rights of Purchaser to own or use any of the Intellectual Property or Licensed IP included in the Intellectual Property and the Company is not, nor as a result of the consummation of the transactions contemplated by this Agreement or the Transaction Documents will be, in violation of any IP License.

(l) The Company maintains and enforces appropriate internal information security policies for the use, processing, confidentiality and security of customer, employee and other confidential data that is consistent with applicable Law and any commitments of the Company under any privacy policies or covenants of the Company. The Company is in compliance in all material respects with all such Laws, policies and commitments. To Seller's Knowledge, the Company has obtained all necessary agreements

and assurances from any third party service providers used in connection with the operation of the Business that such service providers are in compliance in all material respects with any applicable Law, policy or commitment of the Company in respect of privacy. The information technology systems owned, licensed, leased, operated on behalf of, or otherwise held for use by the Company, including all computer hardware, software, firmware and telecommunications systems used by the Company, perform reliably and in material conformance with the specifications or documentation for such systems. Except as set forth on Schedule 5.8(l), the Company has taken all commercially reasonable steps to provide for the archival, back-up, recovery and restoration of the critical business data of the Company, including the provision of hot fail-over server capacity in the event of a systems failure.

Section 5.9 Employee Benefit Plans; ERISA. Set forth on Schedule 5.9 is, as of the date hereof, a true and complete list of each Plan of the Company.

(a) With respect to each Plan, there are no unfunded benefit obligations that have not been accounted for by reserves on the balance sheet contained in the Financial Statements dated as of and for the period ended December 31, 2009.

(b) As applicable with respect to each Plan, Sellers have delivered to Purchaser, true and complete copies of (i) each Plan, including all amendments thereto, and in the case of an unwritten Plan, a written description thereof, (ii) the current summary plan description and each summary of material modifications thereto, (iii) the most recently filed annual report (Form 5500 and all schedules thereto), and (iv) the most recent Internal Revenue Service (the "IRS") determination letter and each currently pending application to the IRS for a determination letter.

(c) The Company and each ERISA Affiliate are in compliance in all material respects with the provisions of ERISA, the Code and other Laws applicable to the Plans. Each Plan has been maintained, operated and administered in compliance in all material respects with its terms and any related documents or agreements and the applicable provisions of ERISA, the Code and other Laws except that in any case in which any Plan is currently required to comply with a provision of ERISA or of the Code, but is not yet required to be amended to reflect such provision, it has been maintained, operated and administered in all material respects in accordance with such provisions.

(d) The Plans which are "employee pension benefit plans" within the meaning of Section 3(2) of ERISA and which are intended to meet the qualification requirements of Section 401(a) of the Code now meet, and all times since their inception have met the requirements for such qualification, and the related trusts are now, and at all times since the inception have been, exempt from taxation under Section 501(a) of the Code.

(e) No Plan is now or at any time has been subject to Part 3, Subtitle B of Title I of ERISA or Title IV of ERISA. Neither the Company nor any ERISA Affiliate has ever contributed to, or been required to contribute to any "multiemployer plan" (within the meaning of Section 3(37) of ERISA) and neither the Company nor any ERISA Affiliate has any Liability (contingent or otherwise) relating to the withdrawal or partial withdrawal from a multiemployer plan.

(f) Except as set forth on Schedule 5.9(f), no Plan provides benefits, including death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by law or (ii) death or retirement benefits under a Plan qualified under Section 401(a) of the Code. Neither the Company nor any ERISA Affiliate has made a written or oral representation to any current or former employee promising or guaranteeing any employer paid continuation of medical, dental, life or disability coverage for any period of time beyond retirement or termination of employment.

(g) The consummation of the transactions contemplated by this Agreement does not (i) entitle any individual to severance pay or other benefits or compensation or (ii) accelerate the time of payment or vesting, or increase the amount of any compensation due, or in respect of, any individual.

(h) The Company has, for purposes of each Plan and for all other purposes, correctly classified all individuals performing services for the Company as common law employees, independent contractors or agents, as applicable.

(i) The Company and each ERISA Affiliate have complied in all material respects with the notice and continuation coverage requirements of Section 4980B of the Code and the regulations thereunder with respect to each Benefit Plan that is a group health plan within the meaning of Section 5000(b)(1) of the Code. Except as set forth on Schedule 5.9(i), no individual is receiving COBRA continuation coverage under any Benefit Plan that is a "group health plan" within the meaning of Section 5000(b)(1) of the Code (a "Group Health Plan"), and no individual has experienced a "qualifying event" (within the meaning of Section 603 of ERISA) during any period which would entitle such individual to, as of the date hereof, elect COBRA continuation coverage under any Benefit Plan that is a Group Health Plan.

(j) Any Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code has been operated in compliance in all material respects with Section 409A of the Code and the applicable document has been amended to comply with Section 409A of the Code.

Section 5.10 Labor Matters. The Company is not now, and has not been in the last five (5) years, bound by or party to any collective bargaining agreement and no application for certification of a collective bargaining agent is pending. The Company is in compliance in all material respects with all applicable Laws affecting employment practices and terms and conditions of employment. The Company has not incurred any liability or obligation under the WARN Act, or similar applicable state Law and the Company has not taken any action prior to the Closing Date which could result in any such Liability to the Company or the Business within the six (6) month period immediately following the Closing Date if, during such six (6) month period, only terminations of employment in the normal course of operations occur. To the Seller's Knowledge, the Company does not employ and has not employed any illegal aliens. There is no pending or, to the Knowledge of the Sellers, threatened, nor has there been since December 31, 2004, any labor strike, dispute, walk-out, work stoppage, slow-down or lockout involving the Company.

Section 5.11 Title to Properties and Assets.

(a) The Company has good and marketable title to all of its assets and properties, free and clear of any Liens, except any Permitted Liens.

(b) The Company does not currently and has not ever owned any real property.

(c) Schedule 5.11(c) contains a complete list of all real property which the Company leases, has agreed to lease, subleases, uses or has an obligation to lease (the "Leased Real Property"). All agreements listed on Schedule 5.11(c) are valid and subsisting and in full force and effect and have not been modified or amended, and there are no material violations by the Company or any landlord of a Leased Real Property of any of the terms or conditions under any such Leased Real Property and no condition has occurred which with notice or lapse of time or both would constitute a default thereunder. The Company has not received notice that the whole or any part of any Leased Real Property is subject to any pending, or to the Knowledge of the Sellers, threatened or contemplated requests, applications or proceedings to alter or restrict any zoning or other use restrictions applicable to the Leased Real Property, or any condemnation or other taking by any public authority which would interfere with the conduct of the Business or the use of the properties or assets of the Company in the Ordinary Course of Business.

(d) Schedule 5.11(d) sets forth all of the tangible personal property owned, leased or held for use by the Company, including all furniture, fixtures, computer equipment, furnishings, leasehold improvements and equipment, and specifically including all computer equipment, book cases, file cabinets and other similar moveable items (the "Personal Property").

Section 5.12 Sufficiency of Assets. Except as set forth in Schedule 5.12, the properties or assets of the Company on the Closing Date (a) constitute all assets (real or personal) necessary and currently used to conduct the Business presently and in substantially the same manner as it has been historically conducted and (b) are in good operating condition and repair, subject to ordinary wear and tear.

Section 5.13 Litigation. Except as set forth on Schedule 5.13 hereto, there are no actions, suits, demands or claims, or legal, administrative or arbitral proceedings, hearings or investigations pending or, to the Knowledge of Sellers, threatened against or involving the Company, any Seller, the Business or any of the properties or assets of the Company, or which could reasonably be expected to prevent, limit, prohibit or restrict the consummation of the transactions contemplated hereby or by the Transaction Documents, or the ability of the Sellers to perform the obligations under this Agreement or the Transaction Documents. Except as set forth on Schedule 5.13 hereto, there are no outstanding Orders of a Governmental Body or arbitration tribunal against or involving the Company, any Seller, the Business or any of the properties or assets of the Company.

Section 5.14 Taxes.

(a) Except as set forth in Schedule 5.14 hereto, all Taxes of or relating to the Company or the Business that are due and payable have been timely paid. All Tax Returns required to be filed by the Company have been duly and timely filed, and such Tax Returns are true, complete and correct in all material respects. The Company has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and has duly and timely (i) made all withholdings and deposits required by Law to be made with respect to Taxes including the portion of such deposits relating to Taxes imposed upon the Company and (ii) withheld and paid over to the proper Governmental Body all material amounts required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

(b) Except as set forth in Schedule 5.14 hereto, the Company has not received any written notice of assessment or proposed assessment of Taxes, nor has any assessment or proposed assessment of a tax penalty been successfully assessed. Except as set forth in Schedule 5.14 hereto, there is no pending, or to the Knowledge of Sellers, threatened Tax audit, investigation or other proceedings (such as a penalty assessment) in respect of Taxes of the Company by any taxing authority for which the Company has received written notice thereof. The Company files Tax Returns in all jurisdictions where they are required to so file, and no claim has ever been made in writing by any taxing authority in any jurisdiction where the Company does not file a particular Tax Return that the Company is or may be subject to taxation by that jurisdiction. Other than Permitted Liens, there are no Liens for Taxes on any of the properties or assets of the Company. The Company has not waived or extended, or requested to waive or extend any statute of limitations in respect of Taxes which waiver or extension is currently in effect. Except as set forth in Schedule 5.14 hereto, the Company has not granted to any Person any power of attorney that is currently in force with respect to any Tax matter.

(c) The Company (i) is not a party to any agreement extending the time within which to file any Tax Return, (ii) has not granted to any Person any power of attorney that is currently in force with respect to any Tax matter, (iii) has no liability for the Taxes of any other Person as a transferee or successor, or by contract or otherwise, (iv) is not a party to any Tax sharing, allocation, indemnity or similar agreement or arrangement (whether or not written), (v) is not nor has ever been a member of any affiliated group that filed or was required to file an affiliated, consolidated, combined or unitary Tax Return (other than a group which TRG Holding, LLC was the common parent), and (vi) does not have any liability for the Taxes of another Person under Treasury Regulation Section 1.1502-6 (or any comparable provision of state, local or foreign Law).

(d) The Company has (i) neither agreed to nor is required to make any adjustments pursuant to Section 481(a) of the Code or any similar provision of state, local or foreign Law (other than be reason of the transactions contemplated by this Agreement), (ii) no knowledge that any taxing authority has proposed any such adjustment, and (iii) no application pending with any taxing authority requesting permission for any changes in accounting methods. No issue has been raised by a taxing authority for which the Company has received written notice thereof in any prior examination of the Company which, by application of the same or similar principles, could reasonably be expected to result in a material proposed deficiency for any subsequent taxable period. The Company will not be required to include any

item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (A) change in method of accounting for a taxable period ending on or prior to the Closing Date; (B) any closing agreement as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign law) executed on or prior to the Closing Date; (C) intercompany transaction or excess loss account described in Treasury regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign law) occurring, or relating to periods, prior to the Closing Date; (D) transaction (such as an installment sale) that occurred prior to the Closing. No transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Code.

(e) The Company has not distributed to its stockholders or security holders stock or securities of a controlled corporation, nor has stock or securities of the Company been distributed, in a transaction to which Section 355 or 361 of the Code applies or in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) that includes the transactions contemplated by this Agreement.

(f) The Company has not executed or entered into any written agreement with, or obtained or applied for any written consents or written clearances or any other Tax rulings from any Governmental Body, relating to material Taxes, including any IRS private letter rulings or comparable rulings of any Governmental Body and closing agreements pursuant to Section 7121 of the Code or any predecessor provision thereof or any similar provision of any Law. The Company has not engaged in any "reportable transactions" as defined in Treasury Regulation Section 1.6011-4(b) or any similar provision of any state, local or foreign Law. The Company is not, nor has ever been, an S corporation within the meaning of Code Section 1361, et seq. (or any comparable provision of state, local or foreign Law).

(g) The Company is not party to any agreement, contract, arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment in connection with the transactions contemplated hereby, either alone or in conjunction with any other payment, event or occurrence, of any "excess parachute payment" within the meaning of Section 280G of the Code.

(h) The Company is not nor has it been a "United States real property holding company" as defined in Section 897(c)(2) of the Code during the applicable period described in Section 897(c)(1)(A)(ii) of the Code.

(i) Upon request, the Company will deliver to Purchaser up until the Closing true and complete copies of all (i) audit reports issued with respect to the six (6) year period prior to the date of this Agreement relating to any Taxes due from or with respect to the Company and (ii) material Tax Returns of the Company for all taxable periods ending on or after December 31, 2005 and estimated tax calculations for the taxable period ended December 31, 2009.

(j) For purposes of this Section 5.14, any reference to the Company shall be deemed to include any Person that merged with or was liquidated into the Company.